**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**JAIME STONE,**

                                                        <u>**COMPLAINT**</u>

                        **Plaintiff,**

            **- against -**

**EAGLE HILL CONSULTING LLC,**

                        **Defendant.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Plaintiff Jaime Stone ("Stone" or "plaintiff") through undersigned counsel, complains of Defendant Eagle Hill Consulting LLC ("Eagle Hill," "the Company," or "defendant") as follows:

<u>**NATURE OF CLAIMS**</u>

1.      Stone is a 66-year-old woman who suffers from the genetic disorder Von Hippel Lindau ("VHL").  VHL is a rare, genetic multi-system disorder in which lesions, including tumors and cysts, grow in certain parts of the body.  The lesions may be either noncancerous or cancerous.  Sometimes, lesions can become cancerous over time and require surgical removal once they grow to a certain size to prevent them from metastasizing.  Symptoms of VHL vary among individuals and depend on the size and location of the lesions.

2.      In Stone's case, the lesions were symptomatic in 1989 when she had a brain tumor.  Since then, Stone has had lesions in her kidneys, her pancreas, and other parts of her body, which have been asymptomatic.  However, due to concerns about the growth of the lesions and potential spread, over the years Stone had surgeries to remove them.  To this day, Stone continues to have surgeries to remove the lesions.

3.      In November 2018, after Stone started working for the Company, her doctors at the National Institutes of Health ("NIH") determined she needed treatment due to the growth of a lesion.  For most of Stone's employment after February 2019, she participated in a drug trial to treat her disorder.  The drug trial required frequent medical appointments and resulted in anemia and significant side effects, including extreme fatigue, debilitating chest tightness, and muscle spasms.  Accordingly, after Stone entered the drug trial in or around February 2019, she requested and received accommodations from the Company, including taking time off to attend doctor's appointments and to recover from her treatment.  Within a short time after she disclosed her disability and sought accommodations, including intermittent leave, however, the Company punished her by placing Stone on an action plan to address purported performance issues in April 2019.  This pattern persisted throughout Stone's tenure.  Within weeks of Stone asking for a second set of accommodations in July 2020, the Company issued Stone a second action plan without any plausible justification and assigned her a coach whose job was to antagonize and demoralize Stone and who made it clear that nothing she did would be enough to succeed.

4.      In addition, after learning that Stone suffered from a disability that required treatment and accommodations, the Company did not assign her work consistent with her skill, experience, or level.  The Company considered Stone, who was among the oldest Eagle Hill employees, as feeble, infirm, and too old for the job.

5.      In early January 2021, Stone met with the Company's Chief Executive Officer and described what had happened to her, including describing her health, her request for accommodations, and her Coach's mistreatment of her. A few weeks after this meeting, the Company fired Stone before the action plan period expired and, improperly, described her firing

as "for cause."  Despite the Company's assertion that Stone's performance was poor, Stone consistently received positive feedback from her project leaders and clients.

6.      Plaintiff brings this action to remedy violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (the "ADA") and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (the "ADEA").

7.      Plaintiff also brings this action to remedy violations of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. (the "FMLA").

8.      Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, liquidated damages, reasonable attorneys' fees and costs of this action, pre- and post-judgment interest, and other appropriate relief pursuant to the ADA, the ADEA, and the FMLA.

## PARTIES

9.      Stone is a resident of Reston, Virginia.  She worked for the Company for over two and a half years until the Company fired her on January 27, 2021.

10.      Eagle Hill is a management consulting firm.  Eagle Hill is a Limited Liability Company incorporated under Virginia law that has a principal place of business in Arlington, Virginia.  Eagle Hill employs approximately 250 individuals

11.      Eagle Hill was Stone's "employer" under the applicable laws, including the ADA, the ADEA, and the FMLA.

## JURISDICTION, VENUE, AND ADMINISTRATIVE EXHAUSTION

12.      This Court has jurisdiction over Stone's ADA claims under 42 U.S.C. § 12117 and ADEA claims under 28 U.S.C. § 1331. This Court has jurisdiction over Stone's FMLA claims under 29 U.S.C. § 2617.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Eagle Hill's global headquarters are located in Arlington, Virginia; because, at all relevant times, plaintiff worked for Eagle Hill in Arlington, Virginia; and because a substantial part of the events or omissions giving rise to the claims occurred in Arlington, Virginia.

14.     On August 13, 2021, plaintiff filed a charge against Eagle Hill alleging unlawful age and disability discrimination and retaliation with the United States Equal Opportunity Employment Commission (the "EEOC").  On May 24, 2022, the EEOC issued plaintiff a notice informing her of her right to sue under the ADA and ADEA.

## FACTUAL ALLEGATIONS

### Stone's Professional Background

15.     Stone received a Bachelor of Arts degree from the University of Southern California and a Master of Science degree in Organization Development and Knowledge Management from George Mason University.  Stone also continues to expand her skills.  For example, in March 2022, Stone became an Associate Certified Coach after completing a training course with the International Coaching Federation.  Recently, Stone also earned an EQ-I 2.0 and EQ 360 certification.

16.     Stone has extensive experience as a senior leader and consultant for multinational corporations and government agencies. For more than 30 years, Stone helped entities and their executives and employees improve their businesses.  For entities in both the public and private sectors, Stone has specialized in leadership and team coaching; she has designed innovative programs to help improve efficiency and communications; and she has helped implement broad organizational changes smoothly with minimal disruption, including large-scale technical process and policy transformations.

17.     Before joining Eagle Hill, Stone worked with federal government agencies and Fortune 500 companies, including Marriott International, Accenture, and AOL.

18.     Stone was the Director of Learning for Marriott International ("Marriott").  In this position, she was responsible for the training strategy, design, development, and global implementation of updated reservation and revenue management initiatives to cross-discipline audiences.  The reservation system, Enhanced Reservation System, and the revenue management system, OneYieldv2, represented a huge step forward for Marriott.  Both systems used algorithmic intelligence to predict daily hotel capacity with greater accuracy than previous systems and also enabled guests to select the room amenities they wanted in advance. This change affected all of Marriott's hotels, requiring staff to learn the technical aspects of the system, change their behavior, and shift their thinking about their work.  Stone's training program was effective as Marriott successfully implemented both the updated reservation and revenue management systems globally with substantial positive business results.

19.     In addition, Stone worked as a Learning and Collaboration Manager for Accenture.  At Accenture, Stone successfully implemented several "Change Management and Learning & Development" programs for public and private sector clients.  During her tenure, Stone received top performance ratings for her work in leadership roles.  For example:

- Stone served as the Global Training Lead for a chemical company in North Carolina.  This program involved delivering training development support to prepare the company to implement technological changes to its System Applications and Products in Data Processing ("SAP") system.  In this role, Stone was responsible for managing a global team of developers to create

blended learning solutions for use in the classroom and system simulations for support after deployment of the program;

- Stone led the learning strategy for an oil and gas client and helped the client significantly reduce costs through centralization of its learning functions;

- Stone led the Change Management workstream for an Oracle upgrade project for a pharmaceutical company that included extensive training, helping executives and other leaders implement the changes, and communicating with key stakeholders; and

- Stone led the workstream for a state government business transformation initiative, including designing professional development programs for the agency workforce.

20.     Stone also worked for AOL as a Learning Strategist and Senior Instructional Designer.

- Stone was responsible for managing enterprise-wide learning programs for a global workforce.

- Based on her success, senior management sent Stone on two trips to India to customize learning for the remote call center team and prepare them for an upgrade to the company's Learning Management System.

- Stone also evaluated and implemented new platforms to help distribute learning programs to the entire company.  Those programs enabled AOL to provide employees with training through various projects and courses to enhance professional growth and build hard and soft skills over time.

6

- For example, during Stone's tenure at AOL, she designed an enterprise-wide learning program that was mandatory for all employees to understand AOL's new business model.  Stone's program won the Brandon Hall Excellence in Learning award for "best use of games in learning."

**Stone's Work at Eagle Hill**

21.     Eagle Hill is a management consulting firm.

22.     Eagle Hill sought out and began actively recruiting Stone in February 2018. Before hiring Stone, Eagle Hill engaged in an extensive process.  Eagle Hill and its recruiting agency interviewed Stone multiple times between February 2018 and May 2018, reviewed Stone's writing samples, and on information and belief, spoke with Stone's references.

23.     On May 8, 2018, Eagle Hill made Stone a contingent offer of employment that Stone accepted.  Stone began working for Eagle Hill on June 12, 2018 as a Manager.

24.     Stone's offer letter stated that "[a]s a Manager, [she] w[ould] typically play a role as a team or project lead on client engagements and contribute to the overall success of the firm." Melissa Jezior ("Jezior"), Chief Executive Officer ("CEO") and President of Eagle Hill, signed the offer letter.

25.     On information and belief, Stone was among the oldest employees at Eagle Hill. When Stone joined the Company, the majority of the employees were in their 20s and 30s.

26.     Stone's first two projects at Eagle Hill were for the United States Food and Drug Administration's ("FDA") Center for Tobacco Products.  Although the projects were separate, they shared Eagle Hill's resources, including a team of four people.

7

27.     After the FDA projects, from January 2020 until July 2020, Stone worked on a project for the FDA's Office of Pharmaceutical Quality (the "OPQ Project") that focused on organizational design.  For the talent working group, Stone was the subject matter expert.

28.     After the OPQ Project, Stone worked on two new projects for the FDA, including a project for the FDA's Office of Regulatory Affairs (the "ORA Project").  The ORA Project involved conducting focus groups, analyzing data from those focus groups, and providing the ORA with recommendations.  Additionally, Stone worked on a project for the FDA's Center for Drug Evaluation and Research (the "CDER Project").  Both projects finished in or around September 2020.

29.     From October 2020 until January 2021, when the Company unlawfully fired Stone, she worked on a project for the United States General Services Administration (the "GSA Project").  Stone was responsible for supporting the Director on a variety of process and business improvement efforts.

30.     In addition to the client projects, Stone also completed multiple internal projects for the Company.  These included a Knowledge Management Team project, where Stone conducted a series of internal focus groups centered on collaboration and put together a change management plan for the Company.  Stone also worked on a project to develop training for Eagle Hill employees.  Additionally, Stone was responsible for providing the Company's talent executive with a qualitative analysis of the Company's employee engagement data.

31.     Throughout her employment, Stone generally received positive feedback from the project leads at the Company and the clients she worked with on projects.  For example, by all accounts, the client for the GSA Project was pleased with her work.

32.     During her employment, the Company had a process to provide employees with frequent feedback.  The Company's performance process required employees to meet with their direct managers on a weekly or biweekly basis to discuss work and receive feedback.  The process was supposed to ensure that managers and employees address performance concerns in a timely way and to permit employees opportunities to improve and thus avoid more serious problems, and to avoid surprising an employee with unanticipated criticism.

33.     Contrary to the Company's practice, even though Stone was meeting with her managers regularly, she did not receive negative feedback until the Company issued her an action plan in April 2019.  Nor did Stone receive negative feedback between completing the first action plan in August 2019 and the Company issuing her a second action plan in August 2020.

34.     In 2019, the Company introduced a systematic promotion system where the Company promoted Managers with at least seven years of consulting experience to "Senior Manager." Because Stone met this requirement, the Company promoted her from Manager to Senior Manager in December 2019.  However, as set forth below, the Company never allowed Stone to perform Senior Manager responsibilities.

**Stone's Disability and Request for an Accommodation**

35.     In 1989, Stone was diagnosed with VHL.  As set forth above, VHL is a rare genetic condition associated with lesions, including tumors and cysts, arising in multiple organs. The tumors may be either noncancerous or cancerous.

36.     From 1989 until approximately 2018, Stone's condition required regular screenings and several surgeries.

37.     After starting her job at Eagle Hill, in November 2018, Stone's doctors told her that she would require treatment due to the progression of her condition.  A lesion located on her

9

left kidney had grown to over three centimeters.  Stone's doctors presented her with two options:
She could have surgery on her left kidney to remove the lesion, or, alternatively, she could enter
a drug trial (the "trial" or the "treatment") at NIH that would not require surgery and therefore
minimize the effect on her work.

38.      In or around December 2018 or January 2019, Stone met with Eagle Hill's
Human Resources Manager to discuss her health.  Stone spoke to an HR Manager and told her
that she suffered from VHL and required treatment.  Stone explained that she had two options:
she could have surgery to remove a lesion or she could enter a drug trial.  Stone asked the HR
Manager about the accommodations available to her.

39.      During this meeting, the HR Manager told Stone that she could use Short Term
Disability if she had surgery.  The HR Manager also explained to Stone that if she entered the
drug trial, she could use Paid Time Off ("PTO") or Leave Without Pay ("LWOP") to attend
medical appointments.  The HR Manager also stated that in June 2019, Stone would become
eligible for leave under the FMLA.

### The Drug Trial, Its Side Effects, and Stone's Accommodations

40.      Ultimately, Stone entered the drug trial instead of opting for surgery.  Stone
started the trial in February 2019 and continued her participation in the trial until approximately
October 2020.

41.      The drug trial required Stone to attend numerous medical appointments for
treatment and evaluation.

42.      The drug trial also caused Stone to experience several side effects.  For example,
Stone's hemoglobin levels dropped significantly within the first few weeks of the treatment and

she developed anemia. As a result, Stone suffered from extreme fatigue.  Stone also experienced

tightness in her chest during exercise and heaviness in her arms and legs.

43.     In addition to the fatigue, the drug trial caused other side effects.  For example,

Stone experienced pains in her chest and upper body, blurred vision, and light-headedness.  The

chest tightness concerned Stone's doctors because they could signify that the treatment was

negatively affecting her heart.  Consequently, the doctors conducted a series of tests on Stone.

The doctors also asked Stone to return to the NIH Eye Institute for a screening.

44.     To help compensate for the side effects of the drug trial, in or around July 2020,

the NIH doctors gave Stone injections of Erythropoietin to help improve her energy levels.

Because Erythropoietin can cause extremely high blood pressure and blood clots, Stone's doctors

needed to evaluate her every other week.  This required that Stone travel to NIH, have her blood

drawn, and wait for a decision.  If the doctors determined that a shot was appropriate, she waited

until a provider could administer it.  Sometimes these visits took one and a half hours if Stone

did not need a shot or up to three hours if she required a shot.

45.     Due to the frequent doctor's visits and side effects that she experienced during

this period, Stone's doctors recommended that the Company permit her to work a reduced

schedule.

46.     Between February 2019 and October 2020, Stone had to miss work to attend

medical appointments and to rest from the drug trial's side effects.

47.     In taking time off as part of her accommodations, Stone used her PTO and unpaid

time off.  In addition, after she became eligible, Stone exercised her FMLA leave rights.  Stone

took two FMLA intermittent leaves that extended from June 10, 2019 until December 9, 2019

and from mid-July 2020 until approximately July 14, 2021.

48.     In support of her requests for reasonable accommodations, Stone provided the Company with medical documentation.  For example, on April 26, 2019, Stone's doctors provided her with a letter stating that she was receiving medical treatment at the National Cancer Institute and that, due to the treatment's side effects, the Company should consider reducing her work schedule to 32 hours per week for the next three months.  Stone provided the April 26, 2019 letter to her Project Lead at the time and to Human Resources.

**The Company Places Stone on an Action Plan**

49.     When Stone started the drug trial and began working a reduced schedule due to the treatment, in or around February 2019, she told her Project Lead for her then-current FDA projects, about her medical condition, treatment, and accommodations.  For each visit to the NIH that required Stone to take time off of work, Stone made a note on her Project Lead's calendar so that she was aware of when and for how long she would be out of the office.

50.     During a weekly meeting with her Project Lead in or around April or May 2019, Stone told her that she was suffering from the treatment's side effects.

51.     In April 2019, just a few months after Stone notified the Company of her disability and requested accommodations, Stone's Project Lead told Stone that the Company was placing her on an action plan.

52.     Eagle Hill purportedly put Stone on an action plan because of concerns the FDA client raised about her work.  This was the first time Stone had received any formal negative feedback about her performance.  Also, on information and belief, the FDA complained about Eagle Hill's work on another project, prior to Stone joining the Company.  However, on information and belief, Eagle Hill did not place any of the responsible employees from that project on an action plan.

53.     Even though Stone continued to suffer due to the side effects of the drug trial, Stone satisfied the first action plan's requirements.

**The Company Did Not Assign Stone Projects Consistent with Her Skills and Experience**

54.     Based on false assumption about Stone's capabilities given her age and disability, after the FDA projects in 2019, the Company did not place Stone on team projects consistent with her skills, experience, or her level.

55.     Stone tried repeatedly to find long-term team projects, but the Company failed to assign her to a project consistent with her level and skills.  For example, in or around late December 2019 or early January 2020, Stone spoke to the Company's Resource Manager.  Stone asked Resource Manager if there were any long-term projects for her.  The Resource Manager told Stone that there were no such projects available at the Senior Manager level.

56.     Because the Company did not assign Stone to a long-term project at the Senior Manager level, in January 2020, Stone accepted an individual contributor position.  The Company assigned Stone to the OPQ Project as an individual contributor position for six months. In this position, Stone no longer had client contact nor any direct reports.

**The Company Places Stone on a Second Action Plan**

57.     As set forth above, in July 2020, Stone sought additional accommodations and intermittent leave due to her disability.  As had been the case earlier in her employment, shortly after she sought her accommodations the Company placed Stone on another action plan.

58.     The Company issued the second action plan on August 17, 2020, less than a month after it approved Stone's July 2020 request for intermittent FMLA leave, and after Stone successfully completed her work for the OPQ Project in July 2020.

59.     Initially, the second action plan was supposed to end during the Fall 2020. However, Stone asked the Company to extend the action plan because the Company had not staffed her on any long-term projects. In or around October 2020, the Company extended the action plan to end on January 30, 2021.

60.     There was no legitimate basis for the second action plan.  Indeed, beyond ordinary feedback given to all employees, Stone did not receive negative performance criticism during her time in the individual contributor position.  To the contrary, Stone's individual contributor work was successful.  Additionally, on information and belief, there were no client complaints about Stone during this period.

61.     Furthermore, the OPQ Project Lead told Stone that she should not be on an action plan because she was not in a position to demonstrate the competencies that the Company said she lacked.

62.      For example, the second action plan criticized Stone for not working with clients to create solutions and for not developing other employees.  The purported deficiencies identified in the action plan, however, had nothing to do with Stone's individual contributor role as there were no longer any employees who reported to her nor did she have client contact.  On information and belief, other employees were not subject to these standards.

### The Company Assigns Stone a Coach

63.     The Company made clear that there was no way for Stone to succeed under the second action plan.

64.     In July 2020, the Company assigned Mary McCall ("McCall"), an Eagle Hill employee, as a "coach" to oversee the second action plan and to determine whether Stone had satisfied the requirements of the second action plan.

14

65.     Pursuant to the Company's policy, Eagle Hill would assign a coach to help an employee get back on track and successfully meet the requirements of his or her action plan. However, from August 2020 until January 2021, when the Company unlawfully fired Stone, her coach McCall met with Stone sporadically and often harassed her.  During Stone's meetings with McCall, she was abusive and demeaning in an effort, on information and belief, to provoke Stone to quit or react in a manner that would provide grounds for termination "for cause."

66.     For example, on one occasion, McCall asked Stone if she wanted to punch her because she had been so antagonistic towards Stone.

67.     McCall's feedback was different from the feedback Stone received from her Project Leaders who Stone worked with during this period.  Furthermore, McCall was dismissive of Stone's accomplishments and applied inconsistent standards when evaluating her work.

### The Company Demotes Stone

68.     Even with the obstacles that the Company created and designed to sabotage Stone's work, from July 2020 to September 2020, Stone successfully completed temporary projects, including the ORA Project.  The ORA Project was a resource-intensive project where the Company conducted focus groups for the FDA and provided an analysis of the information that the focus groups provided.  Stone was responsible for analyzing the focus group data, providing recommendations, and briefing a large group of senior leaders at the ORA.

69.     Additionally, Stone worked on a short-term internal project for the Company's Knowledge Management Team.  The project involved a series of focus groups considering a new platform to enhance the Company's collaboration.  Based on the focus groups' feedback, Stone provided the Project Lead for the Knowledge Management Team with a Change Management Plan to promote broad adoption across the company.

70.     Despite successfully completing the temporary projects, the Company effectively demoted Stone in October 2020.  The Company assigned Stone to the GSA Project as an Associate, which was the most junior role on the project team.  The Company appointed Stone to the Associate position for the GSA Project because it supposedly considered Stone "too high of a risk" in a Manager role.

71.     During the period Stone worked on the GSA Project, the GSA Project Lead often complimented Stone's work.  For example, in or around December 2020, the GSA Project Lead told Stone that although she believed there were some minor tactical issues that Stone needed to correct, overall, Stone was performing at the same level as her Senior Manager peers.  In contrast, around the same time, in December 2020, Stone's coach, McCall, told Stone that if her action plan ended that day (instead of the scheduled date of January 30, 2021), the Company would fire her.

72.     Stone repeatedly tried to address the inconsistent feedback she received from her Project Lead and her coach McCall by asking to have a group meeting with both of them.  McCall, however, refused Stone's requests.  Instead, McCall met with the GSA Project Lead and Stone separately so that there was no transparency in the action plan process.  On information and belief, the Company did not subject others who were on an action plan or receiving coaching to the same standards.

### Stone's Meeting with the CEO

73.     On or about January 8, 2021, Stone met with Jezior, the Company's President and Chief Executive Officer, via video conference to discuss the problems Stone was facing.  Stone told Jezior that the Company placed her on an action plan even though she was dealing with a

severe health problem that overwhelmed her.  However, despite the challenges that Stone was facing, she completed the first action plan successfully.

74.     Furthermore, during the January 2021 meeting, Stone told Jezior that she received different feedback from her "coach," McCall, and her current Project Lead.  Jezior stated to Stone that the GSA Project Lead should be a part of her meetings with McCall.  However, despite Stone's requests, McCall refused to invite the GSA Project Lead to their meetings.

75.     Just a few weeks after Stone's meeting with Jezior, the Company fired Stone.

**McCall Determines that Stone Purportedly Did Not Satisfy the Second Action Plan**

76.     On or about January 25, 2021, the coach that the Company assigned to Stone, McCall, told her that she had concluded that Stone had not satisfied the requirements of the second action plan.

77.     The second action plan required Stone (1) to demonstrate the ability to handle ambiguity by working with the client to co-create solutions based on changing business needs; and (2) to develop others by holding regular Real-Time Development meetings with direct reports and to provide feedback and create opportunities for professional development.

78.     During the January 25 meeting, McCall told Stone that she had determined that Stone met the requirements of the first part of the action plan by working collaboratively with the client. McCall told Stone that the Account Lead for the GSA project and the most senior member of the team stated Stone was meeting performance expectations by providing deliverables to the GSA client in a competent and satisfactory manner.

79.     However, during the January 25, 2021 meeting, McCall told Stone that she had concluded that Stone did not satisfy the second part of the action plan to develop other employees.  McCall's conclusion was baseless.

80.     For example, Stone had met with her then-Project Lead Stevens to talk about ways to develop more junior employees on the team.  With the support of the GSA Project Lead and the GSA Account Lead, Stone posted a message on her Team's website offering coaching services to team members.  Four employees quickly responded with interest, and Stone initiated coaching with three of them before the Company fired her.

81.      In addition to coaching other employees, Stone also met weekly with her workstream partner to help her develop professionally.  Stone and her workstream partner brainstormed ways to increase the Company's work with the GSA client.

82.     Despite Stone's efforts, McCall told Stone that she had not successfully completed the second action plan.  She told Stone that she did not believe Stone's coaching helped other employees develop nor that it demonstrated leadership.

83.     As had been the case throughout the time McCall was Stone's coach, McCall shifted the performance standards applicable to Stone.  For example, during the January 25, 2021 meeting, McCall told Stone that her career advising work did not count towards satisfying the action plan because it was expected of everyone.  She then corrected herself by acknowledging that such work did count, but then stated that Stone's efforts did not demonstrate leadership. Furthermore, she criticized Stone for not continuing her work for the Knowledge Management Team even though the project was not part of her action plan.

84.     Also, the Company limited Stone's ability to develop others.  For example, the Company no longer assigned Stone to have direct reports.  The Company assigned most Senior Managers, many of whom did not suffer from disabilities and required accommodations, to have employees reporting to them.

85.     McCall told Stone that she was notifying Human Resources.  McCall explained to Stone that based on her purported failure to satisfy the action plan, there were three possibilities, including: (1) the Company could extend the action plan; (2) the Company could place Stone on a "Performance Improvement Plan"; or (3) the Company could terminate Stone's employment based on her supposed deficient performance. McCall told Stone that the Company was unlikely to wait until the end of her action plan to decide the outcome.

86.     During the January 25, 2021 meeting, Stone told McCall that she was not surprised by her determination that she had purportedly failed the action plan because the Company had staffed her in an Associate role, and not a Senior Manager Role, for the project. Based on false assumptions about Stone's skills due to her age and disability, McCall responded by telling Stone that the Company could not put Stone in a management position because the Company thought Stone was too big of a risk based on her "history."

**The Company Fires Stone**

87.     On January 27, 2021, the Company fired Stone purportedly "for cause" based on Stone's alleged unsatisfactory performance.

88.     By letter dated January 27, 2021, Eagle Hill stated that Stone's official last day of employment was effective February 1, 2021, but that "effective immediately [she] [was] no longer required to perform work for Eagle Hill."

89.     The Company did not give Stone a chance to fulfill the second action plan.  Eagle Hill fired Stone several days before the action plan's scheduled end date of January 30, 2021. Nor did the Company place Stone on a Performance Improvement Plan despite doing so for other employees before firing them for performance reasons.

19

90.    On information and belief, the Company did not subject non-disabled employees to the same standards as Stone.  For example, in contrast to how the Company treated Stone, on information and belief, the Company permitted employees who did not suffer from disabilities and who did not make reasonable accommodation or FMLA requests to complete their action plans.

91.    The Company also miscoded Stone's firing as "for cause."  Even accepting the Company's position that Stone's performance was poor, which Stone strongly disputes, there was no basis for designating the firing "for cause."

92.    On information and belief, the Company informed the Virginia Employment Commission's unemployment insurance office that Stone's firing was "for cause," which significantly delayed Stone's unemployment benefits.  On information and belief, the Company did so in retaliation for Stone's requests for reasonable accommodations and Stone's protected complaints.  The Virginia Employment Commission subsequently provided a determination on Stone's eligibility for benefits indicating that "[t]he information presented does not establish that the claimant's efforts to meet the employer's standards were negligent . . . It is determined that misconduct has not been shown.  Therefore, the claimant is qualified for benefits."

93.    Additionally, despite the Company's assertion that Stone's performance was poor, Stone consistently received positive feedback from her project leaders and the clients.  For example, in January 2021, the Project Lead for the ORA Project provided Stone with a positive performance evaluation.  The ORA Project Lead's comments included feedback such as "[s]he took the data analysis to heart and really owned this portion of the project" and "[w]e trusted Jaime [Stone] to conduct all the necessary analytics and she accomplished this task to the

fullest." Also, as described above, the feedback that McCall provided to Stone was inconsistent with the input Stone received from her GSA Project Lead.

94.     On information and belief, the combination of Stone's age, her medical condition, and her accommodations caused the Company to view Stone as feeble, infirm, and too old for the job.

**FIRST CAUSE OF ACTION**
**ADA: Discrimination**

95.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 94 of this Complaint as if set forth fully herein.

96.     Plaintiff has had, at all relevant times, a "disability" as that term is defined in the ADA.  Plaintiff was able to perform the essential functions of the job with a reasonable accommodation, and therefore was at all relevant times a "qualified individual with a disability" within the meaning of the ADA.

97.     By the acts and practices described above, Defendant discriminated against Plaintiff on the basis of her disability in violation of the ADA.

98.     Defendant acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights.

99.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of discriminatory practices by Defendant.

**SECOND CAUSE OF ACTION**
**ADA: Retaliation**

100.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 99 of this Complaint as if set forth fully herein.

101.    By the acts and practices described above, Defendant retaliated against Plaintiff for her requesting a reasonable accommodation and for opposing Defendant's unlawful conduct, in violation of the ADA.

102.    Defendant acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

103.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of the retaliatory acts by Defendant.

### THIRD CAUSE OF ACTION
### ADEA: Discrimination

104.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 103 of this Complaint as if set forth fully herein.

105.    By the acts and practices described above, Defendant discriminated against Plaintiff in the terms and conditions of her employment on the basis of her age in violation of the ADEA.

106.    Defendant knew that its actions constituted unlawful discrimination and/or acted with malice disregard for Plaintiff's statutorily protected rights.  These violations were willful within the meaning of the ADEA.

107.    Plaintiff has suffered and will continue to suffer irreparable injury, and monetary damages as a result of Defendant's discriminatory practices unless and until this Court grants relief.

### FOURTH CAUSE OF ACTION
### FMLA: Retaliation

108.    Plaintiff repeats and realleges paragraphs 1 through 107 as if fully set forth herein.

22

109.    By the acts and practices described above, Defendant retaliated against Plaintiff for exercising her rights, in violation of the FMLA, 29 U.S.C. § 2615(a)(2).

110.    Defendant knew that its actions violated the FMLA; these violations of the FMLA were willful and not in good faith.

111.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Defendant's actions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

a.    declaring that the acts and practices complained of herein are in violation of the ADA, the ADEA, and the FMLA;

b.    enjoining and permanently restraining these violations of the ADA, the ADEA, and the FMLA;

c.    directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff;

d.    directing Defendant to place Plaintiff in the position she would have occupied but for Defendant's discriminatory and retaliatory conduct and making her whole for all earnings and other benefits she would have received but for Defendant's discriminatory treatment, including, but not limited to, wages, bonuses, pension, and other lost benefits;

e.    directing Defendant to pay Plaintiff an additional amount as liquidated damages under the ADEA and the FMLA;

f.      directing Defendant to pay Plaintiff compensatory damages, including damages

for emotional distress, humiliation, and pain and suffering;

g.      directing Defendant to pay Plaintiff punitive damages;

h.      awarding Plaintiff her reasonable attorneys' fees and costs;

i.      awarding Plaintiff such interest as is allowed by law, and damages for any adverse

tax consequences stemming from an award; and

j.      granting such other and further relief as the Court deems necessary and proper.

**<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure,

a trial by jury in this action.

Dated:  August 19, 2022                          BERNABEI & KABAT, P.L.L.C.

By: _____
                                                         Alan R. Kabat
                                                         Virginia Bar # 76898
                                                         Attorney for Plaintiff
                                                         1400 16th Street, Suite 500
                                                         Washington, DC 20036-2223
                                                         kabat@bernabeipllc.com
                                                         tel. (202) 745-1942, ext. 242
                                                         fax (202) 745-2627

                                                         VLADECK, RASKIN & CLARK, P.C.

By:  _/s Jeremiah Iadevaia_____
                                                         Jeremiah Iadevaia (New York # 4537783)
                                                         Brandon R. White (New York # 5872254)
                                                         Attorneys for Plaintiff
                                                         565 Fifth Avenue, 9th Floor
                                                         New York, New York 10017
                                                         (212) 403-7300
                                                         *Pro hac vice motions to be submitted*